UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| COLUMBIA EXPORT TERMINAL, LLC, | Case No. 3:18-cv-02177-JR |
| Plaintiff, | |
| v. | FINDINGS AND RECOMMENDATION |
| THE INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, et al., | |
| Defendants. | |

RUSSO, Magistrate Judge:

Plaintiff Columbia Export Terminal, LLC ("CET") brings this action against defendant International Longshore and Warehouse Union ("ILWU"), as well as approximately 150 individually named ILWU members, asserting violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). ILWU moves to dismiss CET's complaint pursuant to Fed. R. Civ. P. 12(b)(6). Alternatively, ILWU moves for partial summary judgment. The individually named defendants subsequently joined in ILWU's motion. For the reasons stated below, ILWU's motion

Page 1 - FINDINGS AND RECOMMENDATION

to dismiss should be granted, ILWU's motion for partial summary judgment should be denied as moot, and this case should be dismissed.

## BACKGROUND

CET operates a grain export terminal, Terminal 5, at the Port of Portland. Am. Compl. ¶ 5 (doc. 61).[1] CET receives grain from inland areas via rail or barge, unpacks the grain at the Port, and then loads it onto ocean-going ships for transport to customers in Asia. Id. The individually named defendants are current or former hourly employees who were dispatched from the Pacific Maritime Association ("PMA")/ ILWU hiring hall to work at Terminal 5. Id. at ¶¶ 1, 7, 8, 58. They are each members of one of two ILWU local chapters, Local 8 or Local 92, and are therefore governed by a collective bargaining agreement ("CBA"). That Agreement dictates the terms and conditions of their work for CET. Id. at ¶ 8; Williams Decl. Ex. A (doc. 27).

Employees are tasked with submitting timesheets to their walking boss, or foreman, indicating the hours worked. Am. Compl. ¶ 9 (doc. 61). The walking boss then delivers each timesheet to CET, who forwards the timesheets via interstate wire to PMA in California. Id. at ¶ 10. Based on those timesheets, PMA compensates the longshore workers (by depositing wages to their bank accounts) and charges CET for the payments. Id. PMA also uses the timesheets to charge CET for assessments used to contribute to employee PMA/ ILWU benefit funds. Id.

In 2014, the individually named defendants began furnishing timesheets "indicating time worked for employees who did not work, and were not even at Terminal 5, for some or all of the

---

[1] After briefing on ILWU's motion was complete, CET filed an unopposed motion to amend the complaint in order to "correct the names of certain defendants whose proper names were not apparent from the time sheets available to CET at the time it initiated this lawsuit, and to make related and minor correction to the damages calculations," which the Court granted. CET's Mot. Am. 1-2 (doc. 59). The parties subsequently stipulated that the filing of the Amended Complaint did not moot the present motion. See generally Joint Stipulation (doc. 76).

Page 2 - FINDINGS AND RECOMMENDATION

indicated time," as revealed by the "Terminal 5 guard logs." Id. at ¶ 11. According to CET, these "inflated" timesheets led to "overbilling" in the amount of $5,319,509 as of 2018. Id. at ¶¶ 12–13.

In December 2018, CET commenced this lawsuit alleging seven claims under 18 U.S.C. § 1962. See generally id. In March 2019, ILWU filed the present motion to dismiss. Briefing was completed on that motion in May 2019.

## STANDARDS

Where the plaintiff "fails to state a claim upon which relief can be granted," the court must dismiss the action. Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). For the purposes of the motion to dismiss, the complaint is liberally construed in favor of the plaintiff and its allegations are taken as true. Rosen v. Walters, 719 F.2d 1422, 1424 (9th Cir. 1983). Regardless, bare assertions that amount to nothing more than a "formulaic recitation of the elements" of a claim "are conclusory and not entitled to be assumed true." Ashcroft v. Iqbal, 556 U.S. 662, 680-81 (2009). Rather, to state a plausible claim for relief, the complaint "must contain sufficient allegations of underlying facts" to support its legal conclusions. Starr v. Bacca, 652 F.3d 1202, 1216 (9th Cir. 2011).

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. Id. at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. T.W. Elec., 809 F.2d at 631.

## DISCUSSION

ILWU argues that CET's claims should be dismissed for three reasons. First, ILWU asserts this lawsuit is preempted under § 301 of the Labor Management Relations Act ("LMRA") because CET's RICO claims require interpretation of the underlying CBA; inasmuch as CET's RICO claims are supplanted by § 301, they fail because CET has not exhausted the CBA's grievance procedures.[2] Def.'s Mot. Dismiss 12-16 (doc. 23). Second, ILWU contends the complaint offers only conclusory allegations that fail to state a claim. Id. at 16-28. Third, ILWU argues that it is entitled to summary judgment on Counts One, Two, Four, and Five "because undisputed record facts establish that ILWU did not receive increased dues payments as a result of the alleged timecard scheme." Id. at 28-31.

---

[2] ILWU produced the CBA between CET and Locals 8 and 92, which the Court can consider in evaluating whether dismissal is appropriate in this context. Stallcop v. Kaiser Found. Hosp., 820 F.2d 1044, 1048 (9th Cir. 1987); see also Marcus v. United Postal Serv., 2014 WL 3421552, *3 (N.D. Cal. July 14, 2014) ("[t]he CBA need not be directly mentioned in the complaint in order for any of its claims to be preempted by the LMRA") (collecting cases). CET does not dispute the authenticity of the CBA attached as Exhibit A to the Williams' Declaration.

I.      **Whether CET's RICO Claims are Preempted by Section 301 of the LMRA**

Section 301 of the LMRA states: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties." 29 U.S.C. § 185(a).³ Although "§ 301 reads as a jurisdictional statute [it] is not simply jurisdictional." Kobold v. Good Samaritan Reg'l Med. Ctr., 832 F.3d 1024, 1032 (9th Cir. 2016) (citation and internal quotations omitted). Rather, § 301 is "a congressional mandate to the federal courts to fashion a body of federal common law to be used to address disputes arising out of labor contracts." Id. (citation and internal quotations omitted).

State and federal claims "grounded in the provisions of a CBA or requiring interpretation of a CBA" are preempted by the LMRA.⁴ Id.; see also Underwood v. Venango River Corp., 995 F.2d 677, 684-85 (7th Cir. 1993), overruled on other grounds by Hawaiian Airlines Inc. v. Norris, 512 U.S. 246 (1994) (applying the analytical framework outlined in Kobold to evaluate whether the plaintiff's RICO claims were preempted by federal labor law). "In addition to promoting the development of a uniform federal labor law, [this rule] is designed in large part to assure that

---

³ Both parties rely on precedent arising under another federal labor law, the Railway Labor Act ("RLA"). Def.'s Mot. Dismiss 12-13 (doc. 23); Pl.'s Resp. to Mot. Dismiss 8 (doc. 40). "The standard for preemption under the RLA is virtually identical to the pre-emption standard under § 301 of the Labor Management Relations Act," such that the Court's analysis relies on both RLA and LMRA cases. Wolfe v. BNSF Ry. Co., 749 F.3d 859, 865 n.2 (9th Cir. 2014) (citation and internal quotations omitted).

⁴ Preclusion, not preemption, is technically the correct term for describing the relationship between two federal laws. Felt v. Atchison, Topeka & Santa Fe Ry. Co., 60 F.3d 1416, 1418-19 (9th Cir. 1995). However, as denoted herein, the preclusion inquiry in this context "is similar to the preemption analysis . . . because both preemption of state law and preclusion of federal statutory remedies are questions of congressional intent." Id. at 1419; see also Alaska Airlines Inc. v. Schurke, 898 F.3d 904, 922-24 (9th Cir. 2018) (en banc), cert. denied, 139 S.Ct. 1445 (2019) (describing the Congressional purpose behind the LMRA). With this in mind, the Court uses these terms interchangeably for ease of reference.

agreements to arbitrate grievances would be enforced, regardless of the vagaries of state [and federal] law and lingering hostility toward extrajudicial dispute resolution." Kobold, 832 F.3d at 1032 (citation and internal quotations omitted).

To determine whether a claim is preempted or precluded, the court applies a two-part test. First, the court examines whether the asserted cause of action involves a right conferred by law independent of the CBA. Id. If the right underlying the plaintiff's claims exists independently of the CBA, the court "moves to the second step, asking whether the right is nevertheless substantially dependent on analysis of a collective-bargaining agreement." Id. (citations and internal quotations omitted). This inquiry "turns on whether the claim can be resolved by 'looking to' versus interpreting the CBA. If the latter, the claim is preempted; if the former, it is not." Id. at 1033 (citations and internal quotations and brackets omitted). In the context of § 301, "the term 'interpret' is defined narrowly – it means something more than 'consider,' 'refer to,' or 'apply.'" Id. (citation and internal quotations omitted).

If a state or federal claim is grounded in the CBA or substantially dependent upon analysis of its terms, it "must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor-contract law." Id. at 1034 (citation and internal quotations omitted). If the CBA prescribes mandatory grievance or arbitration procedures for the resolution of CBA-related disputes, a party governed by the CBA "usually cannot succeed in a suit under § 301 to vindicate personal contract-based rights unless the contractual grievance-arbitration procedure is invoked." Id. (citation omitted). The exhaustion requirement prevents parties bound by the CBA "from sidestepping available grievance procedures [and ensures that any] arbitration provisions do not lose their effectiveness." Truex v. Garrett Freightliners, Inc., 785 F.2d 1347, 1353 (9th Cir. 1985) (citation omitted).

The parties here do not dispute that this case involves a right conferred upon CET by federal law. Def.'s Mot. Dismiss 14-15 (doc. 23); Pl.'s Resp. to Mot. Dismiss 1-23 (doc. 40). The Court then initially must decide whether – under the second step – CET's RICO claims can be resolved by mere reference to, as opposed to interpretation of, the CBA. CET wholly failed to address this issue, despite being afforded the opportunity to submit both excess and supplemental briefing.[5] See Justice v. Rockwell Collins. Inc., 117 F.Supp.3d 1119, 1134 (D. Or. 2015), aff'd, 720 Fed.Appx. 365 (9th Cir. 2017) ("if a party fails to counter an argument that the opposing party makes . . . the court may treat that argument as conceded") (citation and internal quotations and brackets omitted). Instead, CET primarily contends that RICO is not "implicitly repealed" by the LMRA because those statutes are not in conflict and, in any event, RICO is the later enacted statute. Pl.'s Resp. to Mot. Dismiss 1-5 (doc. 40).

Essentially, CET maintains that the doctrine of § 301 preemption is inapplicable, as a matter of law, to federal RICO claims. See Pl.'s Suppl. Br. 2 (doc. 81) ("it is simply not possible for § 301 to have any 'preclusive' effect on CET's RICO claims"). In support of this assertion, CET relies on cases involving Title VII or Fair Employment and Housing Act claims (or other independent statutory rights that are not grounded in a CBA or substantially dependent upon

---

[5] Because CET's 43-page opposition did not address critical aspects of ILWU's motion, the Court ordered supplemental briefing in regard to: (1) whether the CBA in this case made the grievance process mandatory for CET, assuming resolution of its RICO claims did require interpretation thereof; and (2) what preclusive impact, if any, § 301 has if the grievance process is not unambiguously mandatory in regard to an employer. In response to these questions, CET reiterated arguments raised in its opposition, as well as clarified its position that ILWU's invocation of a defense based on the CBA does not trigger § 301 even if it applied to federal claims. Pl.'s Suppl. Br. 1-5 (doc. 81). CET also asserted for the first time that ILWU cannot now rely on the CBA because it failed to move to compel arbitration. Id. at 3, 5-7. Concerning the latter, the precedent cited throughout makes clear that no such motion is required under the present circumstances.

analysis of a CBA's terms), or Garmon preemption,[6] and repeatedly asserts that Hubbard v. United Airlines, 927 F.2d 1094 (9th Cir. 1991) (the primary Ninth Circuit authority cited by ILWU) is no longer good law. Pl.'s Resp. to Mot. Dismiss 7-9, 16, 19-23 (doc. 40). Additionally, CET contends arbitration is not proper because the CBA "does not apply to statutory claims," ILWU and the individually named defendants are not parties to the CBA, and the CBA's grievance process is not mutually mandatory. Id. at 5-20.

Thus, CET either side-steps the issues before the Court or relies on inaccurate statements of law. As ILWU observes, "CET's opposition brief reads as though ILWU invented the doctrine of Section 301 preemption and preclusion out of whole cloth." Def.'s Reply to Mot. Dismiss 4 (doc. 58). As addressed herein, it is well-established that the LMRA supplants federal causes of action grounded in or requiring interpretation of a CBA. See Pearson v. N.W. Airlines, Inc., 659 F. Supp. 2d 1084, 1087-89 (C.D. Cal. 2009) ("[it] is a matter of settled law in the Ninth Circuit, as well as all other circuits to have considered the question," that the RLA applies to and can preempt federal claims dependent on a CBA) (collecting cases).

---

[6] Pursuant to the doctrine of Garmon preemption, "state and federal courts must defer to the exclusive jurisdiction" of the National Labor Relations Board ("NLRB") if "an activity is arguably prohibited or protected by sections 7 or 8 of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq." Milne Emps. Ass'n v. Sun Carriers, 960 F.2d 1401, 1413 (9th Cir. 1991) (as amended). There is no indication in the present case that CET's claims fall within the ambit of the NLRA and/or the NLRB's primary jurisdiction. See Def.'s Reply to Mot. Dismiss 10 (doc. 58) ("ILWU has never contended that the NLRB has jurisdiction . . . CET's claims require CBA interpretation to resolve; an arbitrator, not the NLRB, has authority to so interpret"). As such, CET's contentions concerning primary jurisdiction are wholly irrelevant to the issue of § 301 preemption; by extension, cases arising under Garmon or relating to the NLRA/NLRB are inapplicable. See Brennan v. Chestnut, 973 F.2d 644, 647 n.3 (8th Cir. 1992) (preemption under § 301 presents a "separate issue" from "preemption under Garmon and the NLRA" or, in other words, the NLRB's primary jurisdiction); see also Milne, 960 F.2d at 1408-18 (addressing Garmon preemption as an alternate basis for dismissal only after concluding that "four of [the plaintiff's] seven state law claims are not preempted by section 301").

Page 8 - FINDINGS AND RECOMMENDATION

This form of preemption or preclusion "is not driven by substantive conflicts of law" as CET maintains, but rather by "the need to protect the proper forum for resolving certain kinds of disputes (and, by extension, the substantive law applied thereto)." Alaska Airlines, 898 F.3d at 922. In the context of the LMRA, "the purpose of Congress is to protect the role of grievance and arbitration and of federal labor law in resolving CBA disputes," meaning that § 301 procedurally effectuates "forum preemption" that does not risk "wholesale invalidation" of any state or federal law; it challenges only "the plaintiff's pleading." Id. at 923-26 (citations omitted).

As such, CET's first argument is misguided. This is especially true given that Hubbard has not, in fact, been overruled in regard to the proposition for which it is cited. The sole point Hubbard has been criticized for is its holding that "preemption under the RLA is broader than under § 301." Hubbard, 927 F.2d at 1097-98; see also Hawaiian Airlines, 512 U.S. at 263 n.9 (clarifying that the LMRA's preemption standard applied to RLA cases, in contravention of Hubbard). The Supreme Court thus did not overturn Hubbard's conclusion that the RLA or the LMRA could preempt a RICO claim. Id.

Significantly, cases emanating post-Hawaiian Airlines have continually reaffirmed § 301's preclusive effect where the plaintiff's federal claims were grounded in the CBA or required interpretation thereof. See, e.g., United States v. Palumbo Bros., Inc.,145 F.3d 850, 864-72 (7th Cir. 1998) ("the preemptive force of § 301 displaces any independent federal or state cause of action when the claim concerns a legitimate labor dispute and involves the breach of a collective bargaining agreement"); Fry v. Airline Pilots Ass'n, Int'l, 88 F.3d 831, 836 (10th Cir. 1996) (in deciding § 301 preemption, "the threshold question remains whether resolution of the federal and state law claims of the plaintiffs requires interpretation or application of the CBA"); see also Chicago Dist. Council of Carpenters Pension Fund v. Ceiling Wall Sys., Inc., 915 F.Supp. 939,

Page 9 - FINDINGS AND RECOMMENDATION

944-45 (N.D. Ill. 1996) (noting that, although the Supreme Court had not directly decided the issue, it was nonetheless clear following Hawaiian Airlines that "Congress intended the [LMRA] to preempt RICO claims"); Johnson v. D.M. Rothman Co., Inc, 861 F.Supp.2d 326, 332-33 (E.D. N.Y. 2012) (LMRA precluded employee's federal claim relating to certain wages because resolving that claim necessitated interpretation of the CBA).

Moreover, the fact that defendants are not signatories to the CBA is immaterial. Painting & Decorating Contractors Ass'n of Sacramento v. Painters & Decorators Joint Comm. of E. Bay Ctys., 707 F.2d 1067, 1068-71 (9th Cir. 1983); see also Bloom v. Universal City Studios, Inc., 734 F.Supp. 1553, 1559 (C.D. Cal. 1990), aff'd, 933 F.2d 1013 (9th Cir. 1991) (state law claim alleging breach of CBA against non-signatory defendant was subject to § 301 preemption). This is especially true considering that CET and the relevant local ILWU unions are named therein, and the CBA expressly creates an avenue of redress for both union members and employers. Williams Decl. Ex. A, at 1, 14-16 (doc. 27).

As discussed in greater detail below, the fact that the grievance process may not be unambiguously mandatory in regard to CET does not excuse CET from following that process. CET's remaining argument – that the CBA does not require it to arbitrate a violation of statutory rights (only violations of the CBA) – merely presumes that the complaint's RICO claims are not precluded under § 301.

Moving on to the substantive merits of ILWU's motion, CET alleges the existence of an inflated timecard scheme perpetuated through the predicate acts of mail and wire fraud. Am. Compl. ¶¶ 8-17, 24-25, 27, 32-33, 39, 44, 47, 54-55, 64, 66 (doc. 61). In essence, the issue presented by the complaint is whether the individually named defendants were entitled, in whole

or in part, to any of the approximately five million dollars in regular and overtime wages tendered between 2014 and 2018.

Several provisions of the CBA govern the circumstances under which employees are required to report to Terminal 5 for work, as well as the wages that are authorized once on-site. Williams Decl. Ex. A (doc. 27). Notably, Section 3-1 permits CET to "schedule work as needed to meet production needs." Id. at 3. Section 13-4 clarifies:

> All employees shall be dispatched through the ILWU-PMA Dispatching Hall. When the Employer orders employees from the dispatcher, the Employer shall specify the classifications needed and how many of each classification the Employer requires. It is solely within the Employer's discretion how many employees it requires and what classifications it requires . . .

Id. at 12. Section 19-4 reiterates that CET has sole discretion to determine "the number of employees required to perform an operation." Id. at 19.

Pursuant to Section 4, once an employee is dispatched and reports to Terminal 5, he or she "shall be paid" for a certain amount of work, irrespective of whether such work is available:

> 4-1 There shall be a guarantee of 8 hours of work to employees when ordered and turned to work . . .
>
> 4-3 In the event that the Employer cannot provide a full 8 hours of work, the time not worked shall be defined herein as dead time. Dead time on the day shift Monday through Friday shall be paid for at the straight time rate of pay.
>
> 4-4 All other dead time-nights, weekends and holidays-shall be paid at the prevailing rate of pay.
>
> 4-5 For employees ordered, reporting for work and not turned to, the 4-hour minimum shall apply, except where inability to turn to is a result of insufficient employees to start the operation . . .

Id. at 3.

The CBA goes on to articulate that employees breach the CBA by not timely arriving at "their assigned work station at the commencement time of their shift" or at the conclusion of a

relief period, and by not "being there until the end of their assigned shift (not leaving their work station in advance of the designed quitting time)." Id. at 13. Yet the CBA also contemplates that employees may be ordered to Terminal 5 but "fail to report to work at all or on time," in which case replacement employees may be ordered and work will commence when "there are sufficient employees to work"; different rules apply concerning what amount of work is compensable and the rate of pay in these scenarios. Id. at 4, 12-13. CET may file a written complaint with ILWU regarding any employee who fails to meet the CBA's timeliness and work-site reporting standards. Id. at 13. Likewise, CET "shall have the right to discharge any employee for," amongst other reasons, "failure to perform the work as required in accordance with the provisions of this Agreement."[7] Id. at 17.

The Court finds that, given the legal character of CET's allegations, its RICO claims can only be resolved by interpreting the CBA. Indeed, substantial analysis of the CBA's provisions would be required to decipher whether defendants committed the predicate acts of mail and wire fraud. Namely, the Court would need to ascertain if any of the individually named defendants had the right to dead time pay when they reported to Terminal 5 pursuant to either the 8-hour guarantee (if turned to work) or 4-hour minimum (if not turned to work). Stated differently, the circumstances under which the CBA prohibited employees from leaving their worksites in advance of the scheduled stop time and the effect, if any, of that prohibition on their pay are far from straightforward.

Similarly, the Court would need to weigh the parties' 2014 discussions about employees' freedom to coordinate breaks on a continuous 12-hour shift, as well as the fact that shift splitting

---

[7] The Court notes that the majority of cases invoking § 301 preemption (except those involving breach of no-strike provisions) involve claims brought by an employee as opposed to an employer, likely for the very reason that employers generally possess the additional contractual remedy of termination.

Page 12 - FINDINGS AND RECOMMENDATION

and related practices have been longstanding, open, and widespread throughout the longshore industry. Williams Decl. ¶¶ 6-8 (doc. 27); see also Fry, 88 F.3d at 836 ("a CBA . . . comprises express provisions, industry standards, and norms that the parties have created but have omitted from the collective bargaining agreement's explicit language") (citation and internal brackets and emphasis omitted); Allis–Chalmers Corp. v. Lueck, 471 U.S. 202, 215-16 (1985) (CBAs may contain implied as well as express terms).

In sum, while CET argues defendants engaged in an enterprise to overbill for hours not worked (implicitly in contravention of the CBA), ILWU contends these same hours were authorized expressly by CET (via personnel orders through the ILWU/PMA labor hall) and billed in accordance with the express and implied terms of the CBA that authorize shift splitting, compensation for dead time, etc. Both contentions conclusively establish, if nothing else, that CET's RICO claims are substantially dependent upon analysis of the CBA. See Merryman Excavation, Inc. v. Int'l Union of Operating Eng'rs, Local 150, AFL-CIO, 552 F.Supp.2d 745, 752 (N.D. Ill. 2008) (employer's "RICO claim is preempted by § 301" because resolving whether the defendants committed the requisite predicate act was "contingent upon determination of the terms of the CBA").

## II.     Whether CET was Required to Exhaust Available Grievance Procedures Before Filing Suit

Because the Court must look to and interpret the CBA to determine whether the alleged fraud occurred, CET's RICO claims are precluded by § 301 of the LMRA and the question becomes whether CET has exhausted any mandatory grievance procedures. As discussed above, federal labor policy dictates that a party alleging CBA-related claims is "[o]rdinarily . . . required to attempt to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement" before filing suit. DelCostello v. Int'l Bro. of Teamsters, 462 U.S. 151, 163-64 (1983)

(citation omitted). CET's briefs are silent as to this issue, such that the Court presumes the grievance process has not been attempted or perfected in regard to the present claims. Pl.'s Resp. to Mot. Dismiss 1-23 (doc. 40); Pl.'s Suppl. Br. 1-7 (doc. 81).

Accordingly, CET is foreclosed from proceeding with this lawsuit unless the parties to the CBA "expressly agreed that arbitration was not the exclusive remedy."[8] Republic Steel Corp. v. Maddox, 379 U.S. 650, 657-58 (1965). "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." United Steelworkers of Am. v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582 (1960). A strong presumption nonetheless exists in favor of arbitration to effectuate "the federal policy favoring arbitration" in labor disputes. Granite Rock Co. v. Int'l Bro. of Teamsters, 561 U.S. 287, 301 (2010) (citation and internal quotations omitted); see also Republic Steel, 379 U.S. at 652-53 ("Congress has expressly approved contract grievance procedures as a preferred method for settling disputes and stabilizing the 'common law' of the plant").

Thus, "[a]part from matters that the parties specifically exclude, all [CBA-related disputes] come within the scope of the grievance and arbitration provisions of the collective agreement" and "doubts should be resolved in favor of coverage." United Steelworkers, 363 U.S. at 579-85; see

---

[8] CET intimates that § 301 preclusion and the corresponding exhaustion requirement are irrelevant and the only issue is whether its "claims are arbitrable," which, in turn, hinges on whether ILWU moved to compel arbitration. Pl.'s Suppl. Br. 3, 5-6 (doc. 81). Section 301 merely ensures enforcement of the CBA and "[c]ourts are not to usurp those functions." Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 562 (1976). Where, as here, the parties have mutually agreed to a mandatory grievance process, the failure to exhaust that process "precludes judicial relief for breach of the collective bargaining agreement." Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 986 (9th Cir. 2007); see also Pl.'s Suppl. Br. 3 (doc. 81) (CET acknowledging that a motion to compel arbitration is not required if "the contract makes it a 'condition precedent' for the party seeking relief to initiate arbitration in the first instance"). Further, a party seeking to establish waiver must demonstrate, amongst other things, acts inconsistent with an existing right to compel arbitration and prejudice, and CET has not met this "heavy burden," especially given that ILWU's first substantive pleading was the subject motion. Fisher v. A.G. Becker Paribas Inc., 791 F.2d 691, 694-98 (9th Cir. 1986).

also AT&T Techs., Inc. v. Comm'cns Workers of Am., 475 U.S. 643, 650 (1986) ("only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail" where the CBA's grievance procedures are "broad" and provide "for arbitration of any differences" arising under the CBA) (citation and internal quotations omitted).

Where there is a question of coverage, "it is the court's duty to interpret the agreement and to determine whether the parties intended to arbitrate grievances concerning a particular matter." Granite Rock, 561 U.S. at 301 (citation and internal quotations omitted). The court discharges "this duty by: (1) applying the presumption of arbitrability only where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand; and (2) adhering to the presumption and ordering arbitration only where the presumption is not rebutted." Id. (collecting cases). "The party contesting arbitrability bears the burden of demonstrating how the language in the collective bargaining agreement excludes a particular dispute from arbitration." Standard Concrete Prods. Inc. v. General Truck Drivers, Office, Food & Warehouse Union, Local 952, 353 F.3d 668, 674 (9th Cir. 2003) (citations and internal quotations omitted). The Court must therefore look again to the CBA to resolve whether CET's claims may proceed in federal court under § 301.

Section 16-2 of the CBA defines "grievance as any controversy or disagreement or dispute between the applicable ILWU Local Union and the Employer for the particular grain elevator(s) involved as to the interpretation, application, or violation of any provision of this Agreement." Williams Decl. Ex. A, at 14 (doc. 27) (emphasis added). Section 16-3 establishes the existence of a "Joint Labor Relations Committee for each port consisting of representatives of the applicable ILWU Local Union and representatives of the applicable Employer for the particular grain elevator(s) involved." Id. The Joint Labor Relations Committee "shall have the power and duty to

Page 15 - FINDINGS AND RECOMMENDATION

investigate and adjudicate all grievances or disagreements or disputes under this Agreement." Id. at 15.

Sections 16-4 through 16-8 of the CBA go on to specify that "[a]ll grievances" – except for "health and safety disputes" – "shall be processed" in accordance with the procedures outlined therein, which are initiated by the presentation of a grievance "by a Union representative to the Elevator Superintendent" (i.e., Section 16-4(a)); referred to the Joint Labor Relations Committee if not settled (i.e., Sections 16-4(b) and 16-6); and culminate with final and binding arbitration by "an impartial arbitrator" (i.e., Sections 16-7 and 16-8). Id. at 14-15. In regard to the latter, "either party" may refer the matter to arbitration in the event the grievance "is not resolved by the Joint Labor Relations Committee in a manner satisfactory to both parties." Id. at 15. Section 16-10, which is the final provision within the "Procedures for Handling Grievances and Disputes" module, states: "The Employer shall also have the right to file a grievance and to follow the above grievance procedure in an effort to resolve it." Id.

Sections 16-2 and 16-4 clearly mandate that all CBA-related disputes be resolved via the written grievance process. As ILWU observes, the aforementioned grievance provisions are "universal" – in that they require utilization of the grievance process in regard to "any controversy or disagreement or dispute . . . as to the interpretation, application, or violation" of the CBA – and "bilateral" and "mandatory" – in that the process applies to "[a]ll grievances" involving CET and the individually named defendants. Def.'s Suppl. Br. 2-3 (doc. 80).

In contrast, Section 16-10 is susceptible to various interpretations. The Court nonetheless finds that this section can most reasonably be read as indicating that CET, as an employer entity, possesses the same rights as individual, Union-represented employees when pursuing the mandatory grievance process. Support for this interpretation is found in both the plain language of

Page 16 - FINDINGS AND RECOMMENDATION

the "Procedures for Handling Grievances and Disputes" module, as well as in other provisions of the CBA. See Atkinson v. Sinclair Ref. Co., 370 U.S. 238, 241-43 (1962), overruled on other grounds by Boys Mkts., Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235 (1970) (court may consider entirety of CBA in determining applicability of grievance procedures to a particular dispute). For instance, Section 14-2, which falls more generally within the module regarding employee work standards, provides that the "Employer may file with the Union a complaint in writing against any member of the grain section" and proceed before the Joint Labor Relations Committee (i.e., the second step of the grievance process) if the complaint is not acted upon. Williams Decl. Ex. A, at 13 (doc. 27). Likewise, Section 19-5 contemplates that either the employer or the Union may pursue a grievance "should disputes arise under the provisions of this Section 19," which obligates the Union to protect "the Employer . . . against reprisals for making changes" to operations and introducing new methods, and to "cooperate with the Employer for the enforcement under the contract of such changes." Id. at 19.

In other words, Sections 16-2 through 16-10, especially when read in conjunction with the CBA's other provisions, demonstrate that CET is bound by the mandatory grievance process. Even when read in isolation (as CET advocates), Section 16-10 does not reveal a clear understanding between the contracting parties that CET is free to avoid the CBA's grievance process in favor of a judicial suit. Pl.'s Resp. to Mot. Dismiss 4-5 (doc. 40). In fact, courts have construed virtually identical language as indicating a clear intent to arbitrate. See, e.g., Local 771, I.A.T.S.E. v. RKO General, Inc., 546 F.2d 1107, 1115-16 (2d 1977) (arbitration "was the exclusive remedy available to a party with a grievance" where the CBA stated that either party "shall have the right to refer the matter to arbitration"); see also Allis–Chalmers, 471 U.S. at 204 n.1 (use of permissive

language in the CBA "is not sufficient to overcome the presumption that parties are not free to avoid the contract's arbitration procedures") (citation omitted).

At most, CET's proffered interpretation creates some doubt as to the reach of the CBA's grievance procedures. This ambiguity is inadequate to overcome the strong presumption in favor of arbitrating labor disputes. See, e.g., Kaiser Found. Hosps. & the Permanente Grp., Inc. v. Cal. Nurses Assoc., 2012 WL 440634, *3-4 (N.D. Cal. Feb. 10, 2012) (distinguishing Standard Concrete and concluding that similar CBA grievance procedures were, at best, ambiguous where those procedures expressly applied to "all disputes," such that the plaintiff employer possessed the right to file a grievance and compel arbitration); Contemporary Servs. Corp. v. Serv. Emp. Int'l Union, 50 Fed. Appx. 851, 851 (9th Cir. 2002) (grievance procedures applied to employer-initiated claims where "nothing in . . . the CBA specifically states that it does not apply to claims brought by [the employer]"); Alaska Maritime Emp'rs Assoc. v. Int'l Longshore & Warehouse Union, 2016 WL 6022709, *2-3 (D. Alaska Oct. 13, 2016) (dismissing the plaintiff employer's § 301 claim based on analogous grievance language).

Critically, at no point does the CBA suggest, either explicitly or implicitly, that CET may seek some other remedy beyond the grievance process articulated therein. Accordingly, CET failed to either demonstrate that the CBA excludes the present dispute or rebut the strong presumption in favor of arbitration. See Ceres Marine Terminals, Inc. v. Int'l Longshoremen's Assoc., 683 F.2d 242, 246-48 (7th Cir. 1982) (rejecting the plaintiff employer's argument that the CBA's permissive language, and discussion of other remedies, allowed it to forgo the CBA's grievance procedures, explaining that, even though "ambiguities in the [CBA] offer some support for [the plaintiff employer's] contention . . . the principle that doubts must be resolved in favor of arbitration would lead us to conclude that" exhaustion was required prior to filing suit).

Therefore, CET's failure to exhaust the CBA's grievance procedures is fatal in this case. Because CET's RICO claims are precluded by § 301 and the CBA's mandatory grievance process does not explicitly exclude employer-brought disputes from its reach, dismissal is warranted and the Court need not address the remaining grounds advanced by ILWU in support of its motion.

## RECOMMENDATION

For the foregoing reasons, ILWU's Motion to Dismiss (doc. 23) should be granted and judgment should be prepared dismissing this case. ILWU's request for oral argument is denied as unnecessary.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered as a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment.

DATED this 12th day of June, 2019.

/s/ Jolie A. Russo
Jolie A. Russo
United States Magistrate Judge